**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------**x**
**PALADIN ASSOCIATES, INC. and CMR &**
**ASSOCIATES, INC.,**

**Plaintiffs,**                                                          **18 CV**

         **- against -**                                        **JURY TRIAL**
                                                                          **DEMANDED**

**MERCHANTS AUTOMOTIVE GROUP, INC.,**

                  **Defendant.**
----------------------------------------------------------------**x**

## COMPLAINT

Plaintiffs PALADIN ASSOCIATES, INC. ("Paladin") and CMR &

ASSOCIATES, INC. ("CMR"), by their attorney Harry Weinberg, Law Offices of Harry

Weinberg, PLLC, as and for their complaint against Defendant MERCHANTS

AUTOMOTIVE GROUP, INC. ("Merchants"), allege as follows:

## NATURE OF ACTION

1.      Paladin and CMR are in the business of providing consulting services to

businesses throughout the United States. Their services are aimed generally, in the case

of Paladin, of reducing costs across a number of expense categories and, in the case of

CMR, specifically in the category of insurance.

2.      Paladin and Merchants entered into a written contract ("the Agreement")

dated March 11, 2015. A copy of the Agreement is annexed hereto as Exhibit A. The

Agreement was for a 3-year term – March 11, 2015 to March 11, 2018.

3.      With the full knowledge and consent of Merchants, Paladin engaged CMR

for the purpose of providing CMR's services and expertise to Paladin in the field

insurance cost reduction, an area in which CMR's principal, Christopher M. Roche, is expert.

4.      Paladin and CMR provided services to Merchants pursuant to the Agreement in exchange for a fee to be calculated according to the terms of the Agreement as 35% of all savings achieved as a result of their efforts.

5.      In the first year of the Agreement (March 11, 2015 to March 10, 2016), Merchants paid Paladin and CMR a total of $101,691 calculated on health insurance annual savings of $290,547. The actual savings achieved as a result of the efforts of Paladin and CMR was $405,511. Merchants therefore owes Paladin and CMR an additional $40,237 for the additional $114,964 in savings obtained in the first year of the Agreement.

6.      In the second year of the Agreement (March 11, 2016 to March 10, 2017), Merchants paid Paladin and CMR a total of $137,200 calculated on health insurance annual savings of $392,000. The actual savings achieved as a result of the efforts of Paladin and CMR was $686,812. Merchants therefore owes Paladin and CMR an additional $103,184 for the additional $294,812 in savings obtained in the second year of the Agreement.

7.      In the second year of the Agreement, Merchants paid Paladin and CMR a fee of $20,794 based upon savings of $59,412 in the Property/Casualty spend category pursuant to the Agreement. Although Paladin and CMR obtained an additional savings of $59,412 in the Property/Casualty spend category in the third year of the Agreement (March 11, 2017 to March 10, 2018), Merchants has failed and refused to pay Paladin and CMR any fee for such savings. Merchants therefore owes Paladin and CMR $20,794 based upon savings of $59,412 in the Property/Casualty spend category obtained in the third year of the

Agreement.

8.      In the third year of the Agreement (March 11, 2017 to March 10, 2018), Paladin and CMR obtained savings of at least $185,976 in health insurance savings.  Merchants therefore owes Paladin and CMR at least $65,091 for health insurance savings obtained in the third year of the Agreement.   Merchants has failed and refused to pay Paladin and CMR any fee for such savings and owes Paladin and CMR at least $65,091 for health insurance savings obtained in the third year of the Agreement.

9.      Despite numerous and repeated demands that Merchants pay the amounts owed, Merchants has failed and refused to pay any part of the amounts owed.

## PARTIES

10.      Paladin is a Georgia corporation with its principal business address located at 145 Whitney Valley Walk, Duluth, Georgia.

11.      CMR is a New York corporation with its principal business address located at 445 Park Avenue, New York, New York.

12.      Merchants is a New Hampshire corporation with its principal business address located at 1278 Hooksett Road, Hooksett, New Hampshire.

## JURISDICTION AND VENUE

13.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §1322(a) as there is complete diversity of citizenship of all parties.

14.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 as a substantial portion of all work performed that is the subject of this lawsuit was performed within the City, County and State of New York.

## FACTS

15.      On or about March 11, 2015, Paladin entered into the Agreement with

3

Merchants whereby the parties agreed as follows:

> Merchants hereby engages Paladin, and Paladin accepts the engagement, in each case pursuant to the terms of this agreement to (a) identify cost reduction opportunities, solicit competitive quotations as required, and negotiate, subject always to Merchants' prior written approval, revised terms and conditions as necessary, and (b) identify opportunities for improving Merchants' operating procedures in the sourcing and purchasing of goods and services. The scope of this engagement will include Paladin undertaking (1) required expenditure data analysis, (2) Sourcing Strategy development, (3) the preparation, issuance, analysis and completion of Requests for Proposals (RFPs) and/or e-Auctions, (4) participating in contract negotiations, and (5) contract implementation planning.

Agreement, annexed hereto as Exhibit A at page 1. The Agreement is governed by Georgia law. *Id.* at paragraph 21, page 7.

16.    Pursuant to the terms of the Agreement, Merchants was to pay Paladin 35% of agreed upon estimated savings expected to be realized by Merchants during each 12 month period following implementation of the new contract(s), pricing, idea(s) or process(es) resulting in such savings. *Id.* at paragraph 3, pages 2 and 3.

17.    In the first year of the Agreement (March 11, 2015 to March 10, 2016), Merchants paid Paladin and CMR a total of $101,691 calculated on health insurance annual savings of $290,547. The actual savings achieved as a result of the efforts of Paladin and CMR was $405,511. Merchants therefore owes Paladin and CMR an additional $40,237 for the additional $114,964 in savings obtained in the first year of the Agreement.

18.    In the second year of the Agreement (March 11, 2016 to March 10, 2017), Merchants paid Paladin and CMR a total of $137,200 calculated on health insurance annual savings of $392,000. The actual savings achieved as a result of the efforts of Paladin and CMR was $686,812. Merchants therefore owes Paladin and CMR an additional $103,184 for the additional $294,812 in savings obtained in the second year of the Agreement.

19.     In the second year of the Agreement, Merchants paid Paladin and CMR a fee of $20,794 based upon savings of $59,412 in the Property/Casualty spend category pursuant to the Agreement.  Although Paladin and CMR obtained an additional savings of $59,412 in the Property/Casualty spend category in the third year of the Agreement (March 11, 2017 to March 10, 2018), Merchants has failed and refused to pay Paladin and CMR any fee for such savings.  Merchants therefore owes Paladin and CMR $20,794 based upon savings of $59,412 in the Property/Casualty spend category obtained in the third year of the Agreement.

20.     In the third year of the Agreement (March 11, 2017 to March 10, 2018), Paladin and CMR obtained savings of at least $185,976 in health insurance savings.  Merchants therefore owes Paladin and CMR at least $65,091 for health insurance savings obtained in the third year of the Agreement.   Merchants has failed and refused to pay Paladin and CMR any fee for such savings and owes Paladin and CMR at least $65,091 for health insurance savings obtained in the third year of the Agreement.

21.     Despite numerous and repeated demands that Merchants pay the amounts owed, Merchants has failed and refused to pay any part of the amounts owed.

22.     Pursuant to the Agreement, Merchants was obligated to advise Paladin of its intention to terminate any contract or commercial relationship impacting upon Merchants' obligations or Paladin and CMR's entitlements pursuant to the Agreement.

23.     In or about August 2017, Merchants terminated the services of FM Financial, the health insurance broker introduced to Merchants by Paladin and CMR whose efforts secured coverage resulting in the savings on health insurance coverage identified above.

24.     Merchants failed to notify Paladin and CMR of Merchants' intention

5

to terminate or its actual termination of FM Financial in violation of its obligations to Paladin pursuant to the Agreement.

25.    Merchants' deceitful termination of FM Financial was part of a concerted effort to avoid its obligations to Paladin pursuant to the Agreement by placing its health insurance coverage with another broker or carrier under the same or similar terms as had been obtained by Paladin and CMR and did not communicate with Paladin or CMR about this whatsoever regarding this change while the consulting engagement required Merchants to do so.

26.    To date, despite numerous and repeated requests that it do so, Merchants has failed to identify or disclose to Paladin or CMR the terms and conditions of the health insurance policies with which it replaced the coverage obtained through the efforts of Paladin and CMR, or to identify the broker who placed such coverage.

## **FIRST CAUSE OF ACTION**

27.    Paladin and CMR hereby incorporate by reference all preceding allegations and make them part of this Cause of Action as if set forth fully herein.

28.    There existed a valid contract between Paladin and Merchants.

29.    CMR was a third-party beneficiary to the Agreement between Paladin and Merchants and was required by Paladin and Merchants to sign-off on all aspects of Paladin's performance with which it was involved.

30.    Merchants and CMR performed all of its obligations pursuant to the Agreement and have performed all of the terms and conditions of the Agreement to be performed by them.

31.    Merchants has anticipatorily breached its obligations under the Agreement and is liable to Paladin and CMR for damages incurred by Paladin and CMR as a result thereof.

32.     Merchants has not performed under the Agreement on its part by, *inter alia*, failing to pay to Paladin and CMR amounts due and owing to Paladin and CMR as result of their performance pursuant to the Agreement and by terminating the services of FM Financial without notice to Paladin or CMR.

33.     Paladin and CMR have suffered damages due to Merchants' repudiation and breach of its obligations under the Agreement and are entitled to contractual money damages from Merchants.

**WHEREFORE**, Paladin and CMR respectfully request that the Court enter a judgment in favor of Paladin and CMR and against Merchants for breach of contract in the amount due under the Agreement, the exact amount to be proven at or before trial, plus its attorney's fees, costs, and interest, together with such other and further relief as to the Court shall be deemed just and proper.

## SECOND CAUSE OF ACTION

34.     Paladin and CMR hereby incorporate by reference all preceding allegations and make them part of this Cause of Action as if set forth more fully hereat.

35.     Merchants received and benefited from valuable services rendered to it by Paladin and CMR for which it has yet to compensate Paladin and CMR.

36.     Paladin and CMR are entitled to recover in *quantum meruit* an amount equal to the value of the benefit to Merchants resulting from their services to Merchants.

**WHEREFORE**, Paladin and CMR respectfully request that the Court enter a judgment in favor of Paladin and CMR and against Merchants for *quantum meruit* damages, the exact amount to be proven at or before trial, plus its attorney's fees, costs, and interest, together with such other and further relief as to the Court shall be deemed

just and proper.

Plaintiffs demand a jury trial as to those issues that may be so tried.

Dated: New York, New York
       July 12, 2018

                                        Yours, etc.,

                                        Harry Weinberg, Esq.
                                        Law Offices of Harry
                                        Weinberg, PLLC
                                        Attorney for Plaintiffs
                                        292 Madison Avenue – 16th Floor
                                        New York, N.Y.  10017
                                        (212) 889-4100
                                        harryesq@aol.com

# EXHIBIT A



**Paladin Associates, Inc.**

*Risk Free Cost Reductions*

March 11, 2015

Mr. Tod A. Nestor
Chief Financial Officer
Merchants Automotive Group, Inc.
1278 Hooksett Road
Hooksett, NH 03106

Dear Tod:

We are pleased to confirm the understanding and agreement (this "Agreement") between Paladin Associates, Inc., a Georgia corporation ("Paladin") and Merchants Automotive Group, Inc., a New Hampshire corporation ("Merchants"). The terms of the Agreement are as follows:

## AGREEMENT

Merchants hereby engages Paladin, and Paladin accepts the engagement, in each case pursuant to the terms and conditions of this agreement, to (a) identify cost reduction opportunities, solicit competitive quotations as required, and negotiate, subject always to Merchants' prior written approval, revised terms and conditions as necessary and (b) identify opportunities for improving Merchants' operating procedures in the sourcing and purchasing of goods and services. The scope of this engagement will include Paladin undertaking (1) required expenditure data analysis, (2) Sourcing Strategy development, (3) the preparation, issuance, analysis, and completion of Requests for Information (RFIs), Requests for Quotation (RFQs), Requests for Proposals (RFPs) and/or e-Auctions, (4) participating in contract negotiations, and (5) contract implementation planning. All Sourcing strategies will be approved by Merchants in writing prior to implementation. Paladin shall make no representations, guarantees or warranties or otherwise incur any obligations on behalf of Merchants. Paladin shall have no authority to negotiate or conclude any contract in the name of Merchants, or otherwise bind Merchants in any way, and shall not hold itself out as having any such authority, but rather shall expressly deny any such authority whenever the need or desirability to define Paladin's authority arises.

1.  Subject to the provisions of the Confidentiality Agreement executed by the parties and effective as of February 23, 2015 (the "Confidentiality Agreement"), Merchants agrees to make available to Paladin all information that Paladin reasonably requests in connection with the performance of its obligations hereunder. Merchants agrees to cooperate as reasonably requested by Paladin in Paladin's efforts to obtain these cost reductions or other sourcing benefits. The Confidentiality Agreement is incorporated herein and constitutes an integral part of this Agreement. If, and to the extent Paladin performs any services on Merchants' premises, Paladin shall comply with all applicable policies of Merchants relating to business and office conduct, health and safety and use of Merchants' facilities, supplies, information technology, equipment, networks and other resources.

2.  During the term of this Agreement, Paladin will identify cost reduction opportunities by spend category, analyze current costs, and develop a related Sourcing Strategy and approach. Each of these opportunities will be documented on a separate Sourcing Project Baseline and Savings document (similar to Exhibit A) for Merchants' review and approval as follows:

    a.  Once a project has been identified, the general scope and any special terms will be documented on the template Sourcing Baseline and Savings document in the form of Exhibit A. General Project Plans and Objectives and any Special Requirements or Terms and any

Changes to Contract Terms are documented in this section. In addition, the method to be used to estimate the savings for the project will be selected. With each Party's signature on the Project Approval page (Tab 1), Paladin is authorized to and will begin development and execution of the recommended Sourcing Strategy. As the Parties identify projects, they will cooperate to complete Tab 1 of the Baseline and Savings Agreement document for the project. The Parties agreement about the content of Tab 1 for a project will be demonstrated by that Party's signature on Tab 1. Although the total spend and savings shown on Tab 1 are typically estimates and are not commitments, Paladin agrees that the spend and savings were determined in good faith and represent Merchants' expectations. Once signed by each Party and delivered to the other Party, Tab 1 shall be part of this Agreement.

b. As soon as possible during the project, the Sourcing Project Baseline and Savings document will be updated for the Baseline Costs for the project (Tab 2), and will be presented to Merchants for consideration and, if accepted, approval. Tab 2 of the Baseline and Savings Agreement document is completed as the Baseline Costs for projects are identified. Estimated or Planned Annual Future Volume is typically estimated and agreed at this time. The method to be used to estimate the cost savings for the project shall be identical to Tab 1, except if expressly changed and approved by both parties on Tab 2. General Project Comments and any changes in Plans and Objectives and any Special Requirements or Terms and any Changes to Contract Terms are documented in this section. Each Party's signature on Tab 2 indicates such Party's approval and agreement with Baseline Costs and Estimated Volume. Once signed by each Party and delivered to the other Party, Tab 2 shall be part of this Agreement and supersede any inconsistent provision of Tab 1.

c. Upon completion of the project, the Sourcing Project Baseline and Savings document will be updated to reflect the New Costs and Estimated Savings (Tab 3). Upon Merchants' final written approval of the Estimated Savings on Sourcing Project Baseline and Savings document (Tab 3), Merchants shall pay Paladin a Performance Fee only as specified in Sections 3.a. through 3.h. to the extent any such section may be applicable to such project in accordance with the terms of this Agreement. The Estimated Savings shown on the Sourcing Project Baseline and Savings will generally be calculated using the method agreed to on Tab 2, except if expressly changed and approved by both parties on Tab 3. Tab 3 of the Baseline and Savings Agreement document is completed by mutual agreement of the Parties as the New Costs for projects are finalized. If applicable, Estimated Annual Savings based on Planned Annual Future Volume and the Final Project Comments Special Implementation Terms and Timing are documented on Tab 3. Each Party's signature on Tab 3 indicates such Party's approval and agreement with Baseline Costs and Estimated Volume. Once signed by each Party and delivered to the other Party, Tab 3 shall be part of this Agreement and supersede any inconsistent provision of Tab 1 and Tab 2. Once a project is approved by Merchants, any solicited or unsolicited bids or offers from current or potential suppliers that are received by either Paladin or the Merchants will be considered part of the project savings if the offer is accepted by Merchants. If an approved Sourcing Project, after Tab 1 is signed by both parties, is subsequently canceled or significantly reduced in scope by Merchants without good reason, Merchants shall pay a Project Cancellation Fee of $1,500 per day of effort actually applied and documented by Paladin to the approved project.

d. To offset certain startup costs, Merchants agrees to pay Paladin $5,000 per month as a retainer fee for the first 6 months of this contract. This retainer fee will be deducted from Performance Fees as calculated in Section 3 as incurred, up to a maximum of $30,000. Paladin guarantees that actual savings delivered by Paladin to Merchants will exceed this retainer fee. Paladin further agrees to refund any retainer fees received in excess of Performance Fees earned by Paladin on Estimated Savings for completed projects.

3.   Compensation for the services rendered by Paladin will be as follows:

a. Except only as expressly stated in Sections 2.d. and 3.b. to 3.h., Merchants shall pay Paladin a Performance Fee (the "Performance Fee") equal to thirty-five percent (35%) of agreed upon estimated savings expected to be realized by Merchants during the

2

twelve (12) month period immediately following the complete implementation (excludes ramp-up periods) of the new contract, pricing, idea, or process. For each savings opportunity, the amount of Estimated Savings based on estimated volume shall be agreed to in writing on a Baseline and Savings Document (using the template in Exhibit A) between Merchants and Paladin. Paladin will invoice Merchants for the Performance Fee based on the Estimated Savings approved by Merchants on the Baseline and Savings document (Tab 3) within 30 days after implementation of the new contract, pricing or process identified by Paladin and shall be paid by Merchants within thirty (30) days of receiving an undisputed invoice from Paladin. If implementation of the estimated savings related to the Approved Project is delayed by Merchants for more than ninety (90) days from the anticipated implementation date, Paladin may invoice Performance Fees for the mutually agreed Estimated Savings after ninety (90) days. Merchants will also pay Paladin thirty-five percent (35%) of all refunds or credits received as a result of Paladin's spend analysis, audits, contract reviews, and data analysis.

b. For certain Spend Categories where Merchants elects to implement one of Paladin's Leveraged Purchasing Agreements, the Performance Fee shall equal twenty-five (25%) of agreed upon Estimated Savings expected to be realized by Merchants during the first twelve (12) months of the term of the related supplier contract immediately following the complete implementation (excludes ramp-up periods) of the new contract, pricing, idea, or process change. If these Spend Categories are reviewed by Paladin but savings are realized by Merchants from price reductions without directly utilizing Paladin's LPAs, the Performance Fee will be thirty-five percent (35%) of agreed Estimated Savings during the first twelve (12) months following implementation of the new pricing.

c. Where Paladin is engaged to reduce costs of a multi-year portfolio commodity, (e.g. a Fleet of vehicles, equipment, or similar items) the Performance Fee structure shall be the same as Section 3.a., with the exception that the savings, upon which the fees shall be calculated, shall be the first twelve (12) months of Estimated Savings on each unit, or the total Estimated Savings of each unit turned over during the term of the portfolio's program not to exceed sixty (60) months in length. These cases will be communicated and agreed in advance and documented as part of the Sourcing Project Baseline and Savings document approval process set forth in Section 2.

d. For Energy Procurement, the potential savings are small and the industry practice is to base performance fees on the savings over longer periods of time. In this case, the Performance Fee will be based on Estimated Savings during the shorter of the supply contract term or three (3) years. This case will be communicated and agreed in advance and documented as part of the Sourcing Project Baseline and Savings document approval process set forth in Section 2.

e. For Insurance Policy Procurement, insurance coverage is typically negotiated for a three (3) - year policy period. In that case, a Performance Fee is due on Estimated Savings for each of the three (3) years, or shorter in the event the policy period is less than three (3) years.

f. For certain Spend Categories, such as Marketing and Advertising Expense, the potential savings and favorable operating impacts may be difficult to calculate accurately. In these cases, an hourly or daily fee rate may be more appropriate if agreed to by both parties in advance. These cases will be communicated and agreed in advance and documented as part of the Sourcing Project Baseline and Savings document approval process set forth in Section 2, or in a separate proposal.

g. With mutual written agreement, the Paladin Performance Fees may be changed or limited for an individual spend category and sourcing project. These changes will be mutually agreed and documented and approved on the Baseline and Savings Document for the specific project.

h. Requested additional services such as Supplier Management, Category Management, or other Program Management or other similar short term services, will generally be performed on an hourly or daily fee basis. Paladin will invoice Merchants based on a mutually approved rate per actual applied hour or day. Unless otherwise agreed, such amounts will be invoiced on a weekly basis and paid on a monthly basis.

4. In addition, during the course of this Agreement, Merchants shall reimburse Paladin for reasonable and necessary direct travel and living costs, and any reasonable and approved Spend Analysis and e-Sourcing fees and expenses. All travel, living and other expenses and Spend-Analysis and e-Sourcing fees and expenses must be pre-approved in writing by Merchants, and utilize cost-effective means of transportation. Paladin will invoice Merchants for these charges at actual costs with appropriate (> $25) and sufficient supporting details, bills, documentation and receipts. Invoices for these expenses will be due and payable within thirty (30) days of receipt of invoices.

5. Interest charges shall be assessed at the rate of 1.5% per month on any past due amounts that are not in dispute.

6. Paladin and Merchants shall not disclose to any third party or use for its own benefit, directly or indirectly, any of the private, secret, or confidential information of the other, including, but not limited to, private, propriety, secret, or confidential information relating to such matters as the finances, methods of operation, competition, pricing, marketing plan and strategies, equipment and operational requirements and information concerning personnel, customers, suppliers, unless such information (a) is or becomes generally available to the public other than as a result of a disclosure by the disclosing party or (b) is required to be disclosed by law or by a judicial, administrative or regulatory authority. The Parties agree that all pricing and contracts of Paladin's LPA Suppliers are confidential and/or proprietary information of Paladin ("Paladin Proprietary Information").

7. To the extent Paladin has employees, contractors or other agents who provide services hereunder, Paladin will ensure that they agree to and observe all of Paladin's obligations of the Confidentiality Agreement and be responsible for any breach by its employees, contractors or other agents.

8. Both Parties acknowledge and agree that a breach by it of their respective non-disclosure or non-solicitation obligations set forth herein may cause the other Party irreparable damage for which compensatory damages may be inadequate. Accordingly, both parties, acknowledge and agree that the aggrieved Party shall be entitled to seek equitable relief, including but not limited to injunctive relief, in addition to all legal and equitable rights and remedies to which it may be entitled from such breach.

9. For a period of eighteen (18) months after Paladin provides an Estimated Savings proposal to Merchants for a specific cost savings project, Merchants agrees that if any of the Sourcing Strategy concepts or other proposals of Paladin that are presented for approval on Tab 3 are initially rejected by Merchants but subsequently are implemented by Merchants, the Performance Fee specified in Section 3 will be due and payable to Paladin given the then prevailing savings estimate. Merchants also agrees that if quotations and other pricing information that is developed and provided by Paladin are subsequently used by Merchants within eighteen (18) months of the information being available to independently reduce prices from incumbent suppliers for a project or related projects, the Performance Fee specified in Section 3 will be due and payable to Paladin. Merchants agrees that, once a Sourcing Project has been approved on Exhibit A in accordance with the approval requirements set forth in Section 2.b. of this Agreement, all price proposals received by Merchants within eighteen (18) months of such approval, directly or indirectly, will be considered part of the Project and, if accepted, will be used for project savings calculations. Merchants agrees that Paladin, at its own expense, will have audit rights for eighteen (18) months following the conclusion of the engagement related to any Paladin Sourcing Project, concepts, or other proposals of Paladin.

10. Upon the prior written consent of the other Party, which may be unreasonably withheld in either Party's sole discretion, the Parties may make a public announcement of the business relationship between the Parties as contemplated under the terms of this Agreement. However, this Section 10 shall not restrict either Party from discussing the terms of this Agreement with each Party's respective officers, directors, employees, subcontractors, partners, and attorneys and accountants

4

having a need to know the terms of this Agreement for the purpose of performing this Agreement and who also agree to abide by the confidentiality and other restrictive covenants of this Agreement and the Confidentiality Agreement.

11.   The Parties hereby covenant and agree that for a period of one (1) year from the end date of this Agreement, no Party will (i) induce or solicit, in any way, any current officer or employee of the other Party or any of its Affiliates to resign or sever employment or otherwise alter its relationship with the other party; or (ii) employ any of the current officers or employees of the other Party or any of its Affiliates, so long as such persons are employed by such Party or its Affiliates, in the case of either clauses (i) or (ii) above, without obtaining the prior written consent of the other Party. Nothing in this Section 11 shall prohibit a Party at any time after the date hereof from employing any current officer or employee of the other Party or any of its Affiliates where such employment results from an unsolicited response to a general newspaper, magazine, or Internet posting for employment not targeted to or designed to attract the other Party's employees.

12.   The term of Paladin's engagement hereunder shall extend from the date of signing, unless otherwise specified, through such date as notified of intent to terminate by either party.  However, the provisions of Sections 3 to 5 (but only to the extent that such fees and expenses were properly incurred prior to termination), 6-8, 9 and 11 (but only in each case for a period of 12 months), 12-14, 16, 18, 20, 21 and 22 shall survive the termination of this Agreement.  The Confidentiality Agreement also survives termination of this Agreement.   Notwithstanding, either Party may terminate this Agreement upon at least thirty (30) days' written notice to the other Party.

13.   Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity other than the Parties hereto or their respective successors and permitted assigns, or in the case of Merchants, its subsidiaries, any relationship, rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Paladin hereunder.

14.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

15.   Paladin represents and warrants to Merchants that

   a.   it has the right to enter into this Agreement and to perform fully all of its obligations in this Agreement;
   b.   its entering into this Agreement with Merchants and its performance of the services described herein do not and will not conflict with or result in any breach or default under any other agreement to which it is subject;
   c.   it has the required skill, experience and qualifications to perform the services, it shall perform the services in a professional and workmanlike manner in accordance with best industry standards for similar services and it shall devote sufficient resources to ensure that the services are performed in a timely and reliable manner;
   d.   it shall perform the services in compliance with all applicable federal, state and local laws and regulations including, without limitation, laws and regulations related to data and privacy security and prohibiting anti-trust or anti-competitive business activities;
   e.   Merchants will receive good and valid title to all Deliverables, free and clear of all encumbrances and liens of any kind;
   f.   all Deliverables are and shall be its original work (except for material in the public domain or provided by Merchants) and do not and will not violate or infringe upon the intellectual property right or any other right whatsoever of any person, firm, corporation or other entity.

16.   The Parties intend and agree that Paladin is acting and will act as an independent contractor and no employee, agent, contractor or other person providing services hereunder shall be deemed an employee or agent of Merchants for any purpose whatsoever in performance of Services under this Agreement, and shall have no right or authority to make or undertake any promise, warranty,

or representation, to execute any contract or otherwise to assume any obligation or responsibility in the name of, or on behalf of Merchants except to the extent specifically authorized in writing by Merchants. Without limiting the foregoing, Paladin's employees, agents, contractors or other persons performing services pursuant to this Agreement shall not be eligible for any Merchants' benefits including, but not limited to, insurance programs, medical benefits, workers' compensation insurance, and paid time off. Paladin is responsible for all withholding and employment-related taxes for its employees and contractors.

17.   Except for a breach by either Party of its nondisclosure obligations set forth herein or in the Confidentiality Agreement, and except for claims of third parties that are subject to the indemnifying Party's obligations hereunder, in no event shall either Party be liable to the other Party for any punitive or special damages arising out of this Agreement or the services or deliverables provided hereunder, even if the Parties have been advised of the possibility of such damages. In no event shall either Party's liability for a breach of this Agreement (other than the non-payment by either Party of fees due hereunder) exceed the greater of the available limits of insurance under Section 19 below and an amount representing twenty-four (24) months of fees paid or to be paid by Merchants for services hereunder calculating by adding the sum of the last twenty-four (24) months of fees or if this Agreement has been in place for less than twenty-four (24) months, the amount of monthly fees actually paid annualized for twenty-four (24) months. The foregoing limitation shall apply notwithstanding any failure of essential purpose of any limited remedy.

18.   Each Party (the "Indemnifying Party") agrees to indemnify the other Party and its officers, directors, owners, employees and other agents (collectively, the "Indemnified Party") from and against any and all loss, liability, cost and expense, including reasonable attorneys' fees, incurred by any one or more of the Indemnified Parties by reason of any and all claims, demands, suits, liabilities, or proceedings, to the extent arising from or caused by the negligent act or omission, willful misconduct, violation of law or breach of this Agreement by the Indemnifying Party or its employees, agents or contractors.

19.   The indemnity provisions of this Agreement are in addition to, and not a substitution for or a limitation of, the insurance provisions set forth in this Section 19. Each Party shall obtain and maintain at its expense the following minimum insurance coverage with insurers licensed to do business in all jurisdictions in which the Services will be performed and having an S&P rating of A or above and/or a Best's rating of A10 or above: (a) Workers' Compensation as required under any workers' compensation or similar law in the jurisdiction in which the Services will be performed; (b) Employer's Liability with a limit of at least $1,000,000 per accident; and (c) Commercial General Liability, including coverage for Contractual Liability and Contractor's Protective Liability (if using subcontractors), each with a limit of at least $2,000,000 combined single limit per occurrence, for bodily injury, personal injury and property damage liability. Paladin will name Merchants as an additional primary insured under its policies and maintain such insurance for the duration of the term and provide a certificate of insurance to Merchants complying with these requirements.

20.   Unless otherwise provided herein, any notice or demand required or permitted to be given under this Agreement shall be effective when received and shall be given in writing by email or overnight courier in a sealed envelope, postage prepaid as follows:

If to Merchants:          Tod Nestor
                          Chief Financial Officer
                          Merchants Automotive Group, Inc.
                          todnestor@merchantsfleet.com
                          1278 Hooksett Road
                          Hooksett, NH   03106

If to Paladin Associates:    Donald Hoeppner
Executive Partner
djhoeppner@paladinassociatesinc.com
Paladin Associates, Inc.
145 Whitney Valley Walk
Duluth, GA 30097

Either Party hereto may change the place or the Merchants' representative for the giving of notice by providing written notice to the other Party.

21.    This Agreement, along with the Confidentiality Agreement and the exhibit hereto, constitutes the entire agreement of the Parties with regard to the subject matter hereof and may not be amended or modified except in a written document signed by both Parties and shall be governed by and construed in accordance with the laws of the State of Georgia.  No waiver of any breach or provision of this Agreement shall constitute a waiver of any other breach or provision of this Agreement unless such waiver is in writing and signed by the Party against whom the waiver is sought to be enforced.

22.    This Agreement is for the benefit of the parties hereto and their representatives, successors, and assigns; provided, however, neither party may assign this Agreement, or any right or obligation under this Agreement, without the written consent of the other party.

If the foregoing correctly sets forth the understanding and agreement between Paladin Associates and Merchants, please so indicate in the space provided for that purpose below, whereupon and after this Agreement is signed and delivered by both parties, this Agreement shall constitute a binding agreement as of the last date written below.

PALADIN ASSOCIATES, INC.

By: _____
Donald Hoeppner
Executive Partner

Date: 3/11/15

Merchants Automotive Group, Inc.

By: _____
Tod Nestor
Chief Financial Officer

Date: March 11, 2015

7